No. 3012

Second Circuit

FRIEL v. MURCHISON

(February 18, 1928. Opinion and Decree.)
(March 14, 1928. Rehearing Refused.)
(April 12, 1928. Writs of Certiorari and Review denied by Supreme Court.)

*(Syllabus by the Editor)*

1. Louisiana Digest—Aleatory Contracts—Par. 11; Bills and Notes—Par. 197.

Where the defense to the payment of a check is that it was given for a gambling debt is amply proven to the Court's satisfaction by legal evidence there must be judgment for defendant.

Appeal from the Ninth Judicial District Court, Parish of Rapides. Hon. Leven L. Hooe, Judge.

Action by Frank M. Friel against Henry D. Murchison, et al.

There was judgment for defendants and plaintiff appealed.

Judgment affirmed.

T. F. Hunter; Hakenyos, Provosty and Staples, of Alexandria, attorneys for plaintiff, appellant.

Hawthorn and Stafford, of Alexandria, attorneys for defendants, appellees.

ODOM, J. The plaintiff brought this suit against the heirs and legal representatives of John M. Murchison, who died on April 22, 1924, to collect $1429.00.

He alleges, as a cause of action, that he is the holder and owner in due course and for value of a check for $1429.00 on the Planters Bank of Cheneyville, dated April 17, 1924, made payable to him and signed by said J. M. Murchison, which check was presented in due course and never paid.

The defense is that the check is void because given for a gambling debt, that is, to pay plaintiff for losses sustained by Murchison in a gambling game conducted by plaintiff.

The lower court rejected plaintiff's demands and he has appealed.

## OPINION

This case was before us in February, 1926. (See 3 La. App. 559.)

Originally there was judgment for plaintiff and defendants appealed. This Court reversed the judgment and dismissed the proceedings as in case of non-suit.

Plaintiff renewed his demands in the present suit, in which the lower court rejected his demands and he has appealed.

In support of his demands, the plaintiff offered in evidence a check made payable to him for $1429.00, dated April 17, 1924, and signed by J. M. Murchison, and made proof that the check was never paid because Murchison, the maker, died before it was presented for payment. He prosecutes this suit against the heirs and legal representatives of Murchison.

It is admitted that J. M. Murchison signed the check and delivered it to plaintiff.

In further support of his demands, the plaintiff testified that Murchison went to him at his cigar and news stand in the lobby of Hotel Bentley in Alexandria on Thursday afternoon between 3:30 and 5 o'clock and asked for a cash advance of $1425.00 which he handed him, and that at the same time Murchison purchased candy and cigars or cigarettes to the amount of $4.00 making the total indebtedness of $1429.00, for which amount Murchison gave the check. Whereupon plaintiff rested his case. We shall revert to and discuss plaintiff's testimony later in this opinion.

In support of their defense that J. M. Murchison gave said check to plaintiff to cover his losses in a gambling game conducted by plaintiff in the Bentley Hotel defendants offered no direct, positive proof. But the chain of circumstances which they established is so linked together and so strong that we are wholly convinced that their defense is made out.

In so holding we have not, as in the former case (3 La. App. 559) cast the burden of proof upon plaintiff of showing that the check sued on, a negotiable instrument, was in fact given for a lawful, valid consideration. What we do hold in the present case is that defendants have established their defense to our entire satisfaction by legal evidence which we believe.

Friel, the plaintiff, is a man of considerable means who owns and operates a cigar and newsstand in the lobby of Hotel Bentley in Alexandria. He lives in the hotel and occupies a large room on the fifth floor thereof in which are two beds, one of which is occupied by himself.

In this room he conducts a regular gambling establishment where he and others play stud poker, table stakes, in the usual way, according to the testimony. His paraphernalia consists of a poker table and a dozen chairs. There is no limit to the amount which may be won or lost in the game during a sitting. The players, it seems, usually purchase chips to begin with, amounting to $10.00. If they are wagered and lost, they buy more. A regular dealer is employed. He cuts the game one dollar for each deal, which goes to the house, out of which the cards used are paid for and the dealer is paid $15.00 a week for his services. What goes with the balance is not explained, but the inference is strong that Friel gets it, although he says he does not. He pays rent for the room.

The players settle with the dealer at the end of the game, but if they lose more than the amount of their pocket change they draw checks in favor of Friel for the balance, and if a player is skilled or lucky enough to win more than the dealer can pay, Friel pays off with his check.

Friel says the game is conducted by a chartered club, and one witness says the charter is in the room, suspended over the table. But according to all the testimony, including the admissions of Friel himself, he is president and general manager. The club, it seems, was organized years ago. If there has ever been a meeting of the board of directors, if the club has ever made or lost any money, if the club ever paid any rent on the room, or if the club ever paid any of the players for their winnings, or if there is at the present time a board of directors, there is not a breath of testimony to indicate that fact.

On the contrary, the testimony shows beyond question that it is Friel's club, Friel's gambling establishment, conducted in his private quarters, on which he personally pays rent. The testimony shows further that he controls the game. He says that he would not permit a man to play while intoxicated, that if a player appeared to be intoxicated or was losing more than he should, he would be put out of the game by the players themselves, as they are all gentlemen; but on cross-examination he said that if a player was objectionable to him and he wanted to put him out he thought the players would yield to his wishes. Friel says he employed Ratcliff and Campbell, the dealers, and fixed their compensation, but says the others were consulted and consented.

Of all those who were called as witnesses and who testified that they had participated in these games, each and every one said he understood it to be Friel's game. In other words, the testimony shows that Friel was the "club."

If anything additional is necessary to show that fact, documentary evidence, in the way of checks, supplies this proof. There was offered and admitted in evidence Friel's personal check for $69.00, dated April 2, 1924, payable to Murchison, which Friel admits was for Murchison's winnings in a game.

Now, as to J. M. Murchison's participation in the gambling games conducted by Friel. Murchison was a gambler, somewhat convivial in his habits, and when under the influence of liquor was reckless. Ac-

cording to all the testimony, he gambled in Friel's place. Friel himself says so. It is further established beyond question that he gambled and lost there at about the time, or just before the check sued on was given. Some of the witnesses called by defendants met him in the place and played with him, until 2 o'clock in the morning, on one occasion about two weeks before he died (Murchison died a day or two after giving the check sued on), and that Murchison was a reckless gambler and lost heavily in the game. One witness said he played in two games there with Murchison and that in one Murchison lost and in the other he won.

In addition to the check sued on, there were offered and filed in evidence three checks, one for $10.00, dated 3-29-24, signed by J. M. Murchison, and payable to Friel. Friel says he does not recall what it was for. As the players usually purchased chips to the amount of $10.00 when they entered a game, and as Friel cannot or did not explain, we think the inference that it was for poker chips is reasonable.

There is another check on the same bank dated two days later, 3-31-24, for $791.00, signed by Murchison and made payable to Friel. Friel says he does not know what that check was for, but says that the check is made out in Campbell's handwriting and that Campbell or Ratcliff handed it to him. Campbell was one of the dealers in Friel's poker game and made settlements with the players.

There is another check for $69.00 dated April 2, 1924, payable to J. M. Murchison and signed by F. M. Friel. Friel admits that it was given to pay Murchison for his winnings in the game, and that he, Friel, played in that game for a while. Friel admitted that he cashed another check for $200.00 representing money that Murchison lost in a poker game.

With reference to the check for $791.00 signed by Murchison and made payable to him, Friel says he cashed that check for Bill Ratcliff, and testified:

"I did not see Murchison. I said to Mr. Ratcliff, 'What's this for?' And I said, 'Crops and Women?' and he kind of laughed and nodded his head."

But Ratcliff was one of the dealers in the poker game at that time.

We quote from Friel's testimony as follows:

"Q. Were you responsible for Mr. Murchison's winnings or losings?

"A. No, sir; he would give the dealer a check and would generally make it payable to me and I would cash it down stairs the next day.

"Q. And if he won any, you generally gave him your check?

"A. Yes, sir; or, if the cash was there, they paid him the cash.

"Q. And if the cash was not there, you gave him your personal check?

"A. Ratcliff would settle with me the next day. When Murchison was playing he had charge of it.

"Q. You will admit that along in the course of two or three weeks' time there were considerable dealings between you and Mr. Murchison, and you admit that some of them were poker dealings?

"A. That $69.00 was from the club.

"Q. It was the winnings of a poker game?

"A. Yes, sir.

"Q. And the $200.00, about which you have testified, represented the losings in a poker game?

"A. About that.

"Q. It was about that time, wasn't it?

"A. It was possibly several weeks before that, I don't remember.

"Q. In other words, it was generally in connection with the dealings running from about the first of April until about the seventeenth of April (the date of the check sued on) or the 25th of March?

"A. I would not be positive about it, because I don't know."

About the time or immediately following these transactions, in all of which Bill

Ratcliff and Campbell, the dealers in the game, and Friel, the operator, were connected, Murchison gave Friel the check which is the basis of this suit. The inference that this last check was also given for a gambling debt seems to us irresistible.

Now, going back to Friel's testimony with reference to the check sued on. He says that Murchison went to him in the afternoon on Thursday, April 17, 1924, and told him he wanted $1425.00 in cash, that he wanted some of it for a woman in the restricted district and some of it to pay off down at home (Murchison lived in Avoyelles Parish); that he had some of the money at the cigar and newsstand but not that much, and that he got several hundred dollars, he does not recall how much, from the clerk in the hotel; that he gave Murchison $1425.00 in cash and that Murchison purchased candy and cigarettes amounting to $4.00 and made his check for $1429.00 to cover all. He says Murchison told him he could not afford to write checks for his woman as that would expose him; that the next day was Good Friday when the banks would be closed and that he needed some money down at home.

It seems to us most strange that Murchison would load himself with that much cash and at once betake himself to a house of prostitution in order to give a woman part of it, as Friel said he intended to do, and strange that if Murchison wanted to pay bills down at his home in Avoyelles Parish, why he did not either go to his bank in Cheneyville, on which he drew all his checks, and get the cash, or else pay with checks, as is the almost invariable rule. It is hard to imagine that he had bills so pressing down at his home in Avoyelles Parish that they had to be paid in cash on Good Friday. Certain it is that Murchison could have gotten the cash if he had wanted it from his banker in Cheneyville on Saturday—one day later. Why get a check on the Cheneyville bank cashed in Alexandria to pay bills down at his home in Avoyelles Parish when he could have gotten the cash down there as well?

But, aside from all this, Friel unquestionably could have produced witnesses to corroborate his testimony if the story is true. For instance, he says he obtained several hundred dollars of the cash which he let Murchison have, from the clerk of the hotel. If he did, surely some record was made of the transaction on the hotel books. Not only that, it is probable that the hotel clerk would recall the fact. But the clerk is not called as a witness, and the books are not called for.

Again, Friel says that Murchison was keeping a woman in the restricted district, but on cross-examination he admits that he does not know that of his personal knowledge, that he knows it only through hearsay, but he made no attempt to prove it.

Again, the fact that the check is for exactly $1429.00 is somewhat suspicious. Why the odd dollars? But Friel says Murchison wanted $1425.00 in cash and that he then bought merchandise to the amount of $4.00. That explanation has not helped his case.

Friel's testimony is not corroborated by a single witness, notwithstanding there were some he could have called. Nor is it corroborated by any circumstance.

On the former trial of this case, the record of which is now before us, Friel was asked:

"What connection have you with a gambling room conducted in Bentley Hotel?"

And he answered:

"I have none."

And yet, in the present suit, he made admissions while on the stand which utterly belie that statement.

The defense is that the debt sued for is a gambling debt. The defendants made out a much stronger case on the last trial than they did on the first. Our conclusion is that they have made good their defense. They proved to our satisfaction that the check was given for a gambling debt and therefore plaintiff cannot recover. The District Judge was of the same opinion and rejected plaintiff's demands.

Judgment affirmed with costs.